## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-CV-22401-JJO

**EULELIA KENT,**
       **Plaintiff,**

**v.**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security**
**Administration,**


       **Defendant.**

_____/

### <u>ORDER</u>

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment

(DE# 24, 12/08/2016) and the Defendant's Motion for Summary Judgment (DE# 25, 1/09/2017).

The plaintiff requests the final decision of the Commissioner of Social Security be reversed and

Disability Insurance Benefits ("DIB") be granted under Title II of the Social Security Act

("SSA"). In the alternative, the plaintiff requests the final decision of the Commissioner of Social

Security be vacated and the case be remanded for further administrative proceedings. The

complaint was filed pursuant to the Social Security Act ("SSA"), 42 U.S.C. §405(g), and is

properly before the Court for judicial review of a final decision of the Commissioner of the SSA.

The parties consented to Magistrate Judge jurisdiction, (DE# 22, 10/24/2016), and this matter

was reassigned to the undersigned pursuant to Judge Altonaga's Order dated October 24, 2016.

(DE# 19, 10/24/2016). Having carefully considered the filings and applicable law, the

undersigned enters the following Order.

_____

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

## PROCEDURAL HISTORY

On May 15, 2012, Eulelia Kent ("the plaintiff") filed an application for Supplemental Security Income (hereinafter "SSI"). (Tr. 183–91).[2] The plaintiff's application was initially denied on July 13, 2012, and was denied again on reconsideration on September 7, 2012. (Tr. 104-109, 112-116). The plaintiff requested a hearing before an administrative law judge ("ALJ") which was held on July 8, 2014. (Tr. 35–77). On January 23, 2015, the ALJ denied the plaintiff's application. (Tr. 17–29). The plaintiff filed an appeal to the Appeals Council requesting review of the ALJ's decision. (Tr. 11). The Appeals Council denied the plaintiff's request for review on May 13, 2016. (Tr. 1–6). The plaintiff has exhausted her administrative remedies and this case is ripe for review under 42 U.S.C.§ 1383(c)(3).

## FACTS

### I. Plaintiff's Background and Plaintiff's Hearing Testimony

The plaintiff was born on July 6, 1976, and, according to her Adult Disability Report, Form SSA-3368, the plaintiff completed twelfth grade in November 2001. (Tr. 201, 205). The plaintiff's work history is limited, with only minimal earnings from unskilled positions. (Tr. 195–98). The plaintiff earned less than $6,000.00 in the years 1997, 1998 and 1999. (*Id.*). The plaintiff earned less than $8,400.00 in the years 2000 through 2009. (*Id.*).  The plaintiff stopped working on May 1, 2009.  (Tr. 205). The plaintiff alleges that her manic depression, suicidal thoughts and human immunodeficiency virus (HIV) positive status caused her to be disabled as of April, 9, 2009. (*Id.*).  However, clinical notes for admit dates of October 4, 2013, and January

---

[2] All references to "Tr." refer to the transcript of the Social Security Administration. Moreover, the page numbers refer to those found on the lower right hand corner of each page of the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page numbers that may appear.

27, 2014, indicate that the plaintiff works Saturdays at a Club as a DJ.  (Tr. 919, 943).  The plaintiff believes she is unable to work because she is snappy, moody, irritable, nervous, forgetful, has problems concentrating, has zero tolerance for being around other people, she cries frequently, has many doctor's appointments and is frequently in too much pain to leave her home. (Tr. 62–63).

On July 8, 2014, the plaintiff testified that she lives with six family members. (Tr. 44). The plaintiff further testified she does not help these family members with any housework. (Tr. 47). The plaintiff admitted she is able to maintain her hygiene, cook her food and perform other domestic activities, if needed. (Tr. 51). The plaintiff has had multiple romantic partners including an on-and-off boyfriend of over twelve years to whom the plaintiff was engaged. (Tr. 562, 592). The plaintiff rides public transportation for about an hour to go to her boyfriend's house. (Tr. 47–48). The plaintiff's boyfriend drove the plaintiff to the July 8, 2014, hearing and the boyfriend financially supports the plaintiff. (Tr. 47–48, 944).

The plaintiff testified she can sit, stand and walk for thirty minutes without difficulty. (Tr. 58–59). The plaintiff testified to having pain on the left side of her body, including her hand, arm, leg and foot. (Tr. 58). The plaintiff claims her left hand and left foot are susceptible to cramping. (*Id.*). The plaintiff testified that sometimes she is able to lift her left hand over her head. (Tr. 58, 64). Her right hand has no issues. (Tr. 63). The plaintiff estimates she can lift and carry less than ten pounds without difficulty. (Tr. 59). The plaintiff suffers pseudotumor cerebri[3] and testified she experiences pressure behind her eye, causing headaches lasting about three

---

[3] Pseudotumor cerebri "occurs when the pressure inside your skull (intracranial pressure) increases for no obvious reason." Pseudotumor cerebri description, MAYOCLINIC.ORG, http://www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/home/ovc-20249919 (last visited June 29, 2017).

hours. (Tr. 69–70, 309). The plaintiff is also obese. (Tr. 609).[4]

The plaintiff testified to having a history of substance abuse, which she claims to have quit in 2009, with a three to four week cocaine relapse in 2012. (Tr. 67, 336, 352).  At the ALJ hearing, the plaintiff claimed , with respect to a conviction for food stamp fraud, that she was found guilty of a crime that she did not commit.  (Tr. 52-55).  The plaintiff also reportedly smokes 3–4 cigarettes per day and drinks 1–2 cups of Hennessy each Saturday. (Tr. 919, 943).

The plaintiff, through her friend Thaddeus Stewart, yet written in the first person, completed an Adult Function Report, Form SSA-3373-BK. (Tr. 215–23). In the report, the plaintiff stated she does not need special reminders to take care of personal needs or help or reminders taking medicine. (Tr. 218). The plaintiff stated she cleans her room and bathroom for approximately an hour without the need of help or encouragement. (*Id.*). The plaintiff stated she uses public transportation by herself and shops in stores for food/personal items once a month. (Tr. 219). The plaintiff claimed that her illness has not interfered with her ability to pay bills, count change, handle a savings account and use a checkbook or money orders. (Tr. 219–20). The plaintiff said she watches television everyday and does a few word search puzzles on most days. (Tr. 220). The plaintiff stated she plays cards and watches movies with others "not too often." (*Id.*). The plaintiff stated she has no problems getting along with family, friends, neighbors, or others. (Tr. 221). The plaintiff stated she can pay attention for two or three hours and follow written instructions "pretty good." (*Id.*). The plaintiff further stated "most of the time I follow

---

[4] The plaintiff's body mass index is 33.65, which indicates obesity. Body mass index is a general tool to classify weight class. A body mass index above 30 strongly suggests an individual's weight classification as obese. Body mass index description, CDC.GOV, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last visited June 29, 2017).

spoken directions well. Sometimes I forget and need to be reminded." (*Id.*). The plaintiff stated "I

can get along pretty good with authority figures." (Tr. 222). The plaintiff has never been fired or

laid off from a job because of problems getting along with other people. (*Id.*). The plaintiff

further stated she does not handle stress "too well" and is "not good" at handling changes in

routine. (*Id.*). The plaintiff claimed she was taking medication at the time of completing the

function report, and had no side affects from those medications. (Tr. 223).

## II. Plaintiff's Treating Hospitals and Physicians

The plaintiff was diagnosed with HIV in April 2009, at Jessie Trice Outpatient Medical

Center. (Tr. 309). The plaintiff began treatment with Dr. Susanne Doblecki-Lewis, M.D.,

(hereinafter "Dr. Doblecki") a special immunology physician at Jackson Memorial Hospital in

October 2011. (Tr. 512). The plaintiff elected to delay HAART[5] treatment with Atripla[6] until

2012 because her CD4 count was within a healthy range.[7] (Tr. 309, 454). On April 16, 2013, Dr.

Doblecki noted the plaintiff was doing well with the treatment, except for some bizarre dreams

that were resolved. (Tr. 454). On April 1, 2014, Dr. Doblecki noted the plaintiff was not taking

---

[5] "Antiretroviral therapy (ART) is treatment of people infected with human immunodeficiency virus (HIV) using anti-HIV drugs. The standard treatment consists of a combination of at least three drugs (often called 'highly active antiretroviral therapy' or HAART) that suppress HIV replication. Three drugs are used in order to reduce the likelihood of the virus developing resistance. ART has the potential both to reduce mortality and morbidity rates among HIV-infected people, and to improve their quality of life." *Antiretroviral Therapy*, who.int, http://www.who.int/topics/antiretroviral_therapy/en/ (last visited July 17, 2017).

[6] Atripla is an antiviral medication used to treat HIV. Atripla description, DRUGS.COM, https://www.drugs.com/uk/atripla.html (last visited June 27, 2017).

[7] The plaintiff's lab results have consistently shown her CD4 count to be over 500, with one report reflecting a CD4 count of 486. (Tr. 455, 482, 485, 524, 881). "A normal CD4 count is from 500 to 1,400 cells per cubic millimeter of blood." *How CD4 Counts Help Treat HIV and AIDS*, WEBMD.COM, http://www.webmd.com/hiv-aids/guide/cd4-count-what-does-it-mean#1 (last visited June 27, 2017).

Atripla consistently. (Tr. 602). Dr. Doblecki needed to counsel the plaintiff regarding taking the medication as directed to avoid virological failure and drug resistance. (*Id.*). Dr. Doblecki's treatment notes show that the plaintiff was alert, oriented and had a comfortable appearance. (Tr. 524). Dr. Doblecki also noted that the plaintiff suffered from gastroesophageal reflux disease, anemia, menometrorrhagia[8] and pseudotumor cerebri. (Tr. 454–55).

On July 8, 2014, Dr. Doblecki completed a Residual Functional Capacity (hereinafter "RFC") questionnaire concerning the plaintiff. (Tr. 513). Dr. Doblecki's responses to the questionnaire indicate that the plaintiff can sit, stand and walk for less than two hours each day during an eight hour work day. (Tr. 512). Dr. Doblecki opined the plaintiff would need to sit or lie down for four hours each day in a work situation on an ongoing basis. (*Id.*). Dr. Doblecki also opined the plaintiff could lift, carry, push and pull less than ten pounds "frequently" and do the same with ten pounds "occasionally" in a competitive work situation.[9] (Tr. 513). When prompted with a question concerning clinical findings that show the plaintiff's medical impairments, Dr. Doblecki responded "see psychiatric evaluations" and noted the plaintiff's CD4 count was above 600. (Tr. 512). Dr. Doblecki opined a psychiatric evaluation was needed to determine the full extent of the plaintiff's disability. (Tr. 513).

The plaintiff began treatment with psychiatrist Dr. Dominique Musselman, M.D., (hereinafter "Dr. Musselman") on October 4, 2013. (Tr. 501). Dr. Musselman saw the plaintiff three times, once in 2013 and twice in 2014. (Tr. 592–93, 920, 944). During each visit, Dr.

---

[8] Menometrorrhagia is "[e]xcessive uterine bleeding, both at the usual time of menstrual periods and at other irregular intervals." Menometrorrhagia definition, MEDICINENET.COM, http://www.medicinenet.com/script/main/art.asp?articlekey=4351 (last visited June 29, 2017).

[9] "'Occasionally' means less than 1/3 of the working day; 'Frequently' means 1/3–2/3 of the working day." (Tr. 513).

Musselman noted the plaintiff was oriented to person, place, and time; had appropriate attire, hygiene, speech, and eye contact; was cooperative; had a coherent and goal oriented thought process; and had good/fair judgment. (Tr. 592–93, 920, 944). Dr. Musselman also noted the plaintiff had some difficulty in the cognitive domain of speed processing and motor speed. (Tr. 594). Dr. Musselman subjected the plaintiff to a grooved pegboard test and the results showed moderate impairment of the plaintiff's dominate hand and mild impairment of the plaintiff's non-dominate hand. (*Id.*). On April 1, 2014, and January 27, 2014, Dr. Musselman diagnosed the plaintiff with AXIS II paragraph B Traits and an AXIS V 54 GAF score.[10][11] (Tr. 599, 927).

On April 30, 2014, Dr. Musselman completed a medical source statement (hereinafter "MSS"). (Tr. 501–02). On the MSS, Dr. Musselman marked a dash through AXIS II and diagnosed the plaintiff with AXIS V 45 GAF score. (Tr. 501). Dr. Musselman did not supply any information in response to the question pertaining to dosage and side effects of the plaintiff's medication. (Tr. 502). However, in a later question, Dr. Musselman responded "[the plaintiff] has

---

[10]"Axis V - Global Assessment of Functioning," DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, at 25 (4TH ED. 1994). GAF scores are "not an assessment of a claimant's ability to work, but a global reference scale to aid in the treatment of an ongoing condition." The Commissioner of the Social Security Administration "has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Newsome ex rel. Bell v. Barnhart*, 444 F. Supp. 2d 1195, 1198 (D. Ala. 2006) (citations omitted).

[11] A GAF range of 51 to 60 reflects "Moderate symptoms (e.g. flat and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers)". A GAF range of 61 to 70 reflects "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful, interpersonal relationships." *Global Assessment Functioning*, Access Behavioral Health, a division of Lakeview Center, Inc., https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited July 17, 2017).

not been able to attend appointments in a continuous manner to allow re-evaluation of efficacy or side effects of prescribed medications." (*Id.*).

The plaintiff saw Dr. Diana Mendez, Ph.D., a licenced psychologist, from October 4, 2013, until March 31, 2014, and saw the plaintiff 19 times.  (Tr. 690-691, 843-848, 849-854, 857-862, 870-880, 888-893, 904-916, 938-958).  On March 31, 2014, Dr. Mendez saw the plaintiff for the last time due to insurance reasons and the plaintiff agreed to continue seeing Dr. Rivera beginning on April 9, 2014.  (Tr. 846).  On March 31, 2014, Dr. Mendez diagnosed the plaintiff on Axis I[12] with Major Depressive Disorder, Recurrent, Moderate (296.22).  (Tr. 846). On April 1, 2014, Dr. Mendez wrote a report in which she indicated that the plaintiff made significant progress during her treatment period.  (Tr. 691).

On April 9, 2014, the plaintiff began treatment with psychotherapist, Melanis Rivera-Rodriguez, Psy.D. (hereinafter "Dr. Rivera"). (Tr. 769).  As noted above, the plaintiff was previously treated by Dr. Mendez, but was transferred to Dr. Rivera due to changes in insurance. (Tr. 691–92).  The April 16, 2014, clinic notes of Dr. Rivera reference psychological measures administered on September 23, 2013, with an assessment of severe depression.  The April 16, 2014, clinic notes by Dr. Rivera also reference psychological measures administered on March 31, 2014, with an assessment of moderate depression opined by Dr. Mendez. (Tr. 767–69, 844–46). Dr. Rivera saw the plaintiff eleven times over the three month treatment span in which she diagnosed the plaintiff with different GAF scores increasing from 54 to 65 and AXIS II "799.9 Deferred [diagnosis], Borderline Traits." (Tr. 685–88, 709–12, 722–26, 735–39, 742–46,

---

[12] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder".  *DSM IV*, by DeepDiveAdmin, Wed, December 02, 2015 , PsyWeb.com, http://www.psyweb.com/DSM_IV/jsp/dsm_iv.jsp (last visited July 17, 2017).

760–69, 780–84, 796–800, 838–42, 863–67, 881–85, 897–901, 931–35). Dr. Rivera's treatment notes also suggest moderate symptoms of anxiety as measured by the State-Trait Anxiety Inventory (STAI)[13] and moderate depressive symptoms as measured by the Beck Depression Inventory (BDI).[14] (*Id.*).

On July 3, 2014, Dr. Rivera completed an MSS. (Tr. 503–10). Dr. Rivera diagnosed the plaintiff with Axis I: 296.32 (major depression); Axis II: 799.9[15] an and Axis V 64 GAF score. (Tr. 503). Dr. Rivera opined the plaintiff's impairments caused good and bad days, resulting in the plaintiff likely being absent from work more than four times a month. (*Id.*). Regarding occupational adjustments, Dr. Rivera opined the plaintiff had poor or no ability to relate with co-workers, deal with the public or deal with work stresses. (Tr. 505). Dr. Rivera claimed these limitations were supported by the plaintiff's current mood state and the impact it has on her "ability to engage with others, be emotionally stable and complete complex tasks." (*Id.*). Concerning performance adjustments, Dr. Rivera opined the plaintiff had poor or no ability to understand, remember and carry out complex or detailed job instructions but the plaintiff retained

---

[13] STAI is a test "used . . . to diagnose anxiety and differentiate it from depressive syndromes." Description of STAI, AM. PSYCHOL. ASS'N, http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/trait-state.aspx (last visited June 28, 2017).

[14] BDI is a self-reported inventory that "measures characteristic attitudes and symptoms of depression." Description of BDI, AM. PSYCHOL. ASS'N, http://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression.aspx (last visited June 28, 2017).

[15] "799.9 is a billable ICD-9-CM medical code. "ICD-9-CM codes are used in medical billing and coding to describe diseases, injuries, symptoms and conditions." 799.9 is notably used for deferred diagnosis, no diagnosis, undetermined diagnosis or cause, undiagnosed (disease) and unknown diagnosis. 799.9 description, ICD-9-CM Medical Coding Reference, http://www.icd9data.com/2014/Volume1/780-799/797-799/799/799.9.htm (last visited June 27, 2017).

a fair ability to understand, remember and carry out simple job instructions. (Tr. 506). Dr. Rivera

claimed these findings were backed by objective testing that display the plaintiff's "mild

impairments in memory and moderate impairments in mental speed which limits [the plaintiff]'s

capacity to remember and perform complex job instructions and task[s] within a timely manner."

(*Id.*). Dr. Rivera also opined the plaintiff had poor or no ability to behave in an emotionally stable

manner or relate predictably in social situations. (*Id.*). Dr. Rivera supported these findings with

the following, "according to [the plaintiff]'s reported symptoms and stated diagnosis episodes of

symptoms have been recurrent and difficult to predict as they could be triggered by

environmental stressors and/or self-perceived issues." (*Id.*). Dr. Rivera opined the plaintiff

suffers from a substance addiction disorder, that is in sustained full remission, but would be

disabled even if she did not. (Tr. 508). Dr. Rivera opined the plaintiff satisfied paragraph B and

paragraph C personality traits under B2, B3, B4, C1, C2 and C3. (Tr. 510). This includes marked

difficulties in maintaining social function and concentration, persistence or pace. (*Id.*).

Dr. Rivera opined the plaintiff does not have the capacity to function in sustained daily

work for an eight hour day, five days a week. (Tr. 504).  In her psychotherapist evaluation dated

July 13, 2014, Dr. Rivera responded no to the question "[D]oes this person have the capacity to

function in sustained daily work on an 8 hour day, five days a week basis?"

(*Id.*).  After the negative response, Dr. Rivera wrote the following,

> [B]ased on clinical observations patient struggles with managing
> environmental stressors which impacts her mood state and enhance
> depression symptoms producing sad mood, low energy and difficulties
> with engaging in work related activities. Objective testing utilizing the
> Rey-Auditory Verbal Learning Test and Grooved Peg Board towards
> accessing memory and mental speed patient's result suggested mild and
> moderate impairments.

(*Id.*).

## III. Consultative Examinations

On July 3, 2012, John Egbeazien Oshodi, Ph.D. (hereinafter "Dr. Oshodi"), completed a psychological evaluation of the plaintiff. (Tr. 335). Dr. Oshodi was not a treating physician, and examined the plaintiff at the request of the Office of Disability Determinations. (*Id.*). The plaintiff told Dr. Oshodi that she was jailed twice in 2009 for drug charges and food stamp fraud. (T. 337). Dr. Oshodi opined that the plaintiff's concentration and attention span were weak, her recent memory was fair, her remote memory was adequate, her judgment and insight were fair and her overall attitude was cooperative. (Tr. 337). Dr. Oshodi noted the plaintiff "could not perform calculations such as 3x4." (*Id.*). Dr. Oshodi also noted the plaintiff "presented as oriented to place, person, and time." (*Id.*). Dr. Oshodi had no diagnosis for AXIS II and a diagnosis of a GAF score of 57 for AXIS V. (Tr. 337-38).

Dr. Oshodi opined the plaintiff's

> [A]bility to focus and concentrate on tasks could be limited as she is easily frustrated and irritable. Her ability to perform tasks that require competitive skills or sustained persistence remains weak given her ongoing irritability and low frustration tolerance. Her social interaction skills during this evaluation were marked with signs of sadness and irritability. Her ability to perform domestic activities of daily living such as personal care and hygiene is fair . . . [The plaintiff] stated that she is able to maintain her hygiene, cook her food, and perform other domestic activities. Her ability to adequately perform work activities and fully function under pressure appears to be poor . . . .

(Tr. 338).

## IV. Residual Functional Capacity Assessments

On September 7, 2012, Disability Determination Services (hereinafter "DDS") psychological advisor Eric Wiener, Ph.D., (hereinafter "Dr. Wiener") reviewed the record and opined that the plaintiff "may have a mental impairment, [but] it does not appear to be of

disabling proportions. [The plaintiff] appears capable of performing simple, unskilled repetitive assignments [and] tasks [without] difficulty as evidenced by areas discussed [within] this [Mental Residual Functional Capacity Assessment]." (Tr. 98). Dr. Weiner assessed the plaintiff with having moderate limitations regarding her ability to: 1) carry out detailed instructions, 2) maintain attention and concentration for extended periods, 3) understand and remember detailed instructions, and 4) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods. (Tr. 97–98). Dr. Weiner found no other significant limitations. (*Id.*).

On July 12, 2012, DDS advisor George Grubbs Psy.D., (hereinafter "Dr. Grubbs") reviewed the record and opined that the plaintiff's mental impairment was not disabling. (Tr. 86). Dr. Grubbs further opined that the plaintiff had mild restrictions of activities of daily living, no difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 83).

On September 6, 2012, DDS medical advisor P.S. Krishnamurthy, M.D. (hereinafter "Dr. Krishnamurthy), reviewed the record and opined that the plaintiff's symptoms are "partially credible." (Tr. 96). Dr. Krishnamurthy opined the plaintiff could occasionally lift and/or carry fifty pounds and frequently lift and/or carry 25 pounds. (*Id.*). Dr. Krishnamurthy further opined the plaintiff could sit, stand and/or walk, with normal breaks, for about six hours in an eight-hour day. (*Id.*).

## V. Vocational Expert's Testimony

At the hearing, the vocational expert (hereinafter "VE"), Lisa J. Garrity, testified before the ALJ. (Tr. 71). The VE testified there was work in the region for the plaintiff based on this

hypothetical question posed by the ALJ:

> Younger individual with a high school education or equivalent, the following exertional/nonexertional limitations: Standing and walking, sitting up to six hours each in an eight-hour day with a break every two hours; lifting and carrying 20 pounds occasionally; 10 pounds frequently; pushing and pulling 20 pounds occasionally, 10 pounds frequently; and then with regard to nonexertional basic mental work-related activities, despite occasional difficulties with basic mental work-related activities including occasional depression, the individual remains able to understand simple instructions, learn simple instructions, carry out simple instructions; make simple work-related decisions; respond appropriate to supervision with the proviso that occasional contact with supervisors; respond appropriately to coworkers, with the proviso occasional contact with coworkers; and occasional contact with the public; and then respond appropriately to usual work situations; and handle changes in order to work setting appropriately on a sustained and continuing basis . . . .

(Tr. 72–73).

The VE was then examined by the claimant's attorney. (Tr. 37, 74). After adding the restrictions placed by the treating physicians to the ALJ's hypothetical, the VE testified the plaintiff would be precluded from sustaining work in the national economy. (Tr. 76). These limitations included: 1) being off task over fifteen percent of the work day, 2) having to miss four days a month due to bad days, and 3) stooping, crouching and climbing stairs limited to three percent of a work day. (Tr. 75–76). The VE opined that a younger individual, with a GED education and the physical RFC of light, could not sustain employment if they had "poor or no ability in the following work-related skills: relate to co-workers, deal with the public, deal with work stressors, understand, remember, carry out complex or detailed instructions, behave in an emotionally stable manner [and] relate predictably in social situations." (Tr. 76).

## ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can last for a continuous period of not less than twelve months . . . ." 42 U.S.C. §§ 416(I);

423(d)(1); 20 C.F.R. § 404.1505 (2017).[16] The impairments(s) must be severe, making the plaintiff "unable to do his previous work . . . or any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1505-404.1511.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 404.1520(a)-(f). The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(1)(I). If so, a finding of non-disability is made and the inquiry ends. *Id.*.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(a)(1)(ii). If the plaintiff does not, then a finding of non-disability is made and the inquiry ends. *Id.*.

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R.§ 404.1520(d), Subpart P, Appendix I. 20 C.F.R. § 404.1520(a)(1)(iii). Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulation requires a finding of disability without further inquiry into the plaintiff's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1517, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" to perform his or her past relevant work. "Residual functional capacity"("RFC"), is defined as "what you can do despite your limitations." 20 C.F.R. § 404.1520(a)(1)(iv). This determination takes into

---

[16] All references to the Code of Federal Regulations are to the 2017 edition.

account "all relevant evidence," including medical evidence, the claimant's own testimony, and the observations of others. *Id.* If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at the fifth step that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e)-(9); *See Barnes v. Sullivan*, 932 F.2d 1357, 1459 (11th Cir. 1991) (holding the claimant bears the initial burden of proving that he is unable to perform pervious work).

Fifth, if the plaintiff cannot perform his or her past relevant work the ALJ must decide if the plaintiff is capable of performing any other work in the national economy. 20 C.F.R. § 404.1520(a) (1)(v).

## ALJ'S FINDINGS

At step one, the ALJ determined the plaintiff had not engaged in substantial gainful activity since May 15, 2012, the application date. 20 C.F.R. § 416.971; (Tr. 19).

At step two, the ALJ determined the plaintiff has affective mood disorder and asymptomatic HIV. 20 C.F.R. § 416.920(c); (Tr. 22). The ALJ found these impairments "cause more than minimal functional limitations in terms of the claimant's ability to perform basic work activities." (Tr. 19). The ALJ also noted the plaintiff had been assessed with polysubstance abuse, which has been in sustained full remission since 2009, barring a brief relapse in July 2012. (*Id.*). The ALJ found the plaintiff's diagnoses of "polysubstance addiction disorder, pseudotumor cerebri, GERD, and anemia are considered to be non-severe, causing no more than minimal functional limitations in terms of the claimant's ability to perform basic work activities." (Tr. 19–20).

At step three, the ALJ found the plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926)." (Tr. 20). With respect to listing 14.08, the ALJ found no documented evidence of HIV coupled with any listed conditions. (Tr. 20). The ALJ also found the plaintiff's "mental impairment does not meet or medically equal the criteria of listing 12.04." (*Id.*).

In the decision, the ALJ assessed whether the "paragraph B" criteria were satisfied by the severity of the plaintiff's mental impairment. (*Id.*). In order to satisfy the "paragraph B" criteria, "mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."[17] (*Id.*). The ALJ then noted the plaintiff has mild difficulties in activities of daily living. (*Id.*) The ALJ based this finding on the plaintiff's admission that she can take care of personal needs such as cook her food, do her laundry, ride public transportation to medical appointments, clean her room and bathroom, shop in stores for food and personal items and work as a DJ at a club. (*Id.*). With regard to social functioning, the ALJ found the plaintiff has mild difficulties. (*Id.*). The ALJ relied on the plaintiff's ability to ride public transportation without problems, play cards and watch movies with others, work as a DJ in a club and have a boyfriend that drove her to the hearing. (Tr. 20–21). Regarding concentration, persistence or pace, the ALJ found the plaintiff has moderate difficulties. (Tr. 21). The ALJ relied on the plaintiff self reported statements that she could "follow written and verbal instructions pretty well, spent time with others playing cards and watching movies and spent her days watching television and doing word search puzzles." (Tr. 21) (internal citations omitted).

---

[17] "A marked limitation means more than moderate but less than extreme." (Tr. 20).

16

The ALJ claimed these findings were supported by the treatment notes of record, showing the plaintiff ceased psychiatric treatment in September 2012 due to improvement of symptoms. (*Id.*). The plaintiff then restarted treatment with a psychiatrist in October 2013, but testified to only seeing the psychiatrist every three months. (*Id.*). The ALJ also relied on the plaintiff's psychotherapist's assignment of GAF scores in the 60s, indicative of only mild symptoms. (*Id.*). The ALJ also based these findings on the September 7, 2012, report of the DDS psychological consultant where the consultant opined the plaintiff's "mental impairment caused mild restriction in activities of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace." (*Id.*). The ALJ also noted that there is no medical evidence pointing to episodes of decompensation. (*Id.*).

The ALJ noted that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (*Id.*). The ALJ assessed whether the "paragraph C" criteria were satisfied, and noted that the evidence failed to establish the presence of "paragraph C" criteria. (*Id.*).

At step four, the ALJ determined the plaintiff

[H]as the residual functional capacity to perform the full range of light work, as defined in 20 C.F.R. 416.967(b), except fully additional mental limitations. Mentally, the [plaintiff] can understand, remember, and carry out short, simple instructions. The [plaintiff] can make simple work related decisions. The [plaintiff] can occasionally interact appropriately with co-workers. The [plaintiff] can occasionally respond appropriately to supervisors. The [plaintiff] can occasionally interact appropriately with the public. The [plaintiff] can respond appropriately to usual work situations and respond appropriately to changes in a routine work setting on a sustained and continuing basis.

(Tr. 22).

The ALJ found the plaintiff did not demonstrate that she was as limited as alleged

17

because she did not satisfy her burden of showing she has a medically determinable impairment in accordance with 20 C.F.R. 416.912. (Tr. 23). The ALJ ultimately found that "the [plaintiff]'s medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (Tr. 25).

The ALJ gave little weight to all treating physicians, some weight to the DDS medical advisor and great weight to the DDS psychological advisor. (Tr. 23-29). The ALJ did not provide a weight analysis on the consultative psychological examiner's medical opinion. (*Id.*).

The ALJ gave little weight to treating physician Dr. Doblecki because her opinion was "not well supported by the treatment notes of record and [was] inconsistent with the evidence on the whole." (Tr. 23). The ALJ based this finding, in part, on Dr. Doblecki's deferment to psychiatric evaluations for a determination of the "full extent" of the plaintiffs limitations. (*Id.*). The ALJ also noted that Dr. Doblecki's treatment notes do not indicate the suggested physical limitations opined, because while the plaintiff's viral load fluctuated, the plaintiff was neither medically compliant nor consistent with the anti-retroviral medication. (Tr. 23–24).

The ALJ gave little weight to treating psychiatrist Dr. Musselman's opinion because "it [was] internally inconsistent, [was] not well supported by the treatment notes of record, and [was] inconsistent with the evidence of record as a whole" (Tr. 24). The ALJ noted that in her MSS, Dr. Musselman diagnosed the plaintiff with major depression-recurrent-severe and a GAF score of 45, while Dr. Musselman's treatment notes assessed the plaintiff with major depression-recurrent-moderate and a GAF score of 54. (*Id.*). The ALJ also noted Dr. Musselman "did not place any limitations on the [plaintiff]'s activities." (*Id.*).

The ALJ gave little weight to treating psychotherapist Dr. Rivera's opinion because it was

18

"internally inconsistent and [was] not well supported by the treatment notes of record. [The opinion was] also inconsistent with the evidence of record as a whole." (Tr. 25). The ALJ pointed to the inconsistencies of Dr. Rivera's MSS and treatment notes. Dr. Rivera's MSS assessed the plaintiff with major depression and a GAF score of 64, yet her treatment notes assessed the plaintiff with "depression of 'moderate' severity and assigned GAFs of 63, indicative of only mild symptomatology." (*Id.*). The ALJ noted Dr. Rivera acknowledged that "objective testing for memory and mental speed suggested only mild to moderate limitations." (*Id.*). The ALJ also noted that Dr. Rivera stated she was not aware of the plaintiff's medication side effects and failed to identify the plaintiff's psychiatric medication in her MSS. (*Id.*). The ALJ also indicated that the record does not support Dr. Rivera's opinion concerning the plaintiff's "poor" or inability to deal "with coworkers and the public, work stressors, behaving in an emotionally stable manner, and relating predictably in social situations." (*Id.*). The ALJ's decision speaks at length concerning the plaintiff's activities of daily living that support this finding. (Tr. 25–27). The ALJ further noted in the decision that Dr. Rivera "opined that the [plaintiff]'s ability to perform the majority of unskilled work requirements was 'fair' or seriously limited, but not precluded." (*Id.*).

The ALJ gave some weight to reviewing DDS medical advisor Dr. Krishnamurthy's opinion "because it was well supported by the treatment notes at that time." (Tr. 24) The ALJ found that Dr. Krishnamurthy was "not privy to all of the evidence submitted at the hearing level, which shows the [plaintiff] is somewhat more limited" than what Dr. Krishnamurthy had opined. (*Id.*).

The ALJ gave great weight to the reviewing DDS psychological advisor Dr. Weiner's opinion" because it was well supported by the treatment notes, and is consistent with the

evidence as a whole." (Tr. 26).

The ALJ did not state with particularity what weight was given to the examining psychologist Dr. Oshodi's medical opinion. (Tr. 17–29). The ALJ referred to Dr. Oshodi's MSS only for the plaintiff's admissions to Dr. Oshodi that she had: 1) used illicit substances, 2) acknowledged a guilty finding regarding public assistance fraud to Dr. Oshodi, but denied the guilty finding at the ALJ hearing, and 3) that she could maintain her hygiene, cook her food and perform other domestic activities. (Tr. 20–27).

At step five, the ALJ determined the plaintiff was not disabled because there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 28). In making that determination, the ALJ relied on the testimony of the VE, which the ALJ found was consistent with the information contained in the Dictionary of Occupational Titles. (Tr. 27).

## STANDARD OF REVIEW

The Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *see Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding the reviewing court must not re-weigh evidence or substitute their discretion). On judicial review, decisions made by the defendant (the Commissioner of Social Security) are conclusive if supported by substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g) (2006); *see Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). Eleventh Circuit Courts have determined that "substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind

would accept as adequate to support a conclusion. *See Miles v. Charter*, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact, no presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145011456 (11th Cir. 1991) (holding "Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide the facts anew, reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. *See Miles*, 84 F.3d at 1400; *see also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *See Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. (*Id.*).

## **LEGAL ANALYSIS**

The plaintiff challenges the ALJ's decision of January 23, 2015, and asserts the Commissioner's decision is not based on substantial evidence and contains errors of law. (DE #24 at 2, 12/08/2016). The plaintiff raises five issues for consideration: 1) the ALJ failed to state with particularity the weight given to the consultative psychologist's medical opinion; 2) the ALJ

did not properly consider and analyze all relevant evidence; 3) the ALJ did not provide sufficient justification for discounting the opinion of a treating physician; 4) the ALJ's functional assessment is not supported by either a treating physician or examining medical source; and 5) the ALJ posed an improper hypothetical question to the VE, thus disability was established by the testimony of the VE. (DE #24 at 6–17). The undersigned disagrees with the plaintiff that the ALJ erred in his decision.

### I. The ALJ Did Not Err with Respect to Stating  What Weight was Given to the Consultative Psychologist's Medical Opinion.

The medical opinions[18] of treating physicians are entitled to great weight, absent good cause otherwise.[19] *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The medical opinions of one time examiners are not entitled to deference or great weight. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). However, "the ALJ must state with particularity the weight given to different medical opinions and reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  A reviewing court cannot determine whether a decision has been made rationally and is supported by substantial evidence without such a statement. (*Id.*). Thus, the *Winschel* Court opined that when an ALJ does not specify the grounds for his decision, the

---

[18] "Medical opinions are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including [the plaintiff's] symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178–79 (11th Cir. 2011) (quoting 20 CFR section 404.1527(a)(2), 416.927(a)(2)).

[19] "Good cause" exists when the doctor's opinion is not supported by the evidence, the evidence supported a contrary finding or the doctors' opinions were conclusory or inconsistent with their own medical records.  *Lewis*, 125 F.3d 1440.

reviewing court will decline to affirm. (*Id.*).

> Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

The plaintiff argues that the ALJ committed an error of law because the ALJ did not provide an "assessment of the evidentiary weight given to" Dr. Oshodi's opinion.  (DE #24 at 6). Dr. Oshodi was a consultative psychologist, not a treating doctor.  The plaintiff contends that under *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987), the ALJ is required to state with particularity the weight given to different medical opinions.

Citing to *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155 (11th Cir. 2004) and *McSwain v. Bowen*, 814 F.2d 617 (11th Cir. 1987), the defendant asserts that, "the opinions of one-time examiners, i.e., non-treating doctors, are not entitled to deference or special consideration."  (DE #25 at 10).  The defendant further notes that under *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875 (11th Cir. 2013) "an ALJ need not give good reasons for the weight she assigns to opinions who, like Dr. Oshodi, examined but did not treat the claimant." (DE #25 at 10).   The undersigned finds that under *Denomme*, the ALJ was not required to provide an "assessment of the evidentiary weight given to" Dr. Oshodi's opinion as the plaintiff asserts was necessary.  The undersigned concludes that upholding the ALJ's opinion with respect

23

to this issue is appropriate and that there was no error on the part of the ALJ regarding the stated weight given to Dr. Oshodi.

### II. The ALJ Properly Considered and Appropriately Analyzed All Relevant Evidence.

An ALJ must consider the combined effects of all impairments. *Davis v. Shalala*, 985 F.2d 533; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir.1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir.1987). Multiple impairments can be evidence of the plaintiff's disability even though, individually, the impairments would not be considered disabling. *Walker*, 826 F.2d at 1001; *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir.1984). The law of this circuit, as analyzed in *Williams v. Barnhart*, 186 F. Supp. 2d 1192, 1199 (M.D. Ala. 2002), is "somewhat ill-defined" concerning the ALJ's responsibilities in articulating the consideration given to the plaintiff's combination of impairments. 186 F. Supp. 2d at 1199. This ambiguity stems from two cases: "*Walker* and its progeny and *Jones* and its progeny."[20] *Williams*, 186 F. Supp. 2d at 1199. The plaintiff contends this Court should follow the *Walker* standard, while the defendant suggests this Court should follow *Jones* standard. (DE #24 at 14); (DE #25 at 11).

*Walker* holds that "it is the duty of the . . . [ALJ] to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." 826 F.2d 996 at 1001 (quoting *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir.1984); 20 C.F.R. § 416.923). In *Walker*, the ALJ failed to mention all of the plaintiff's physical impairments, except for the proclamation that "these 'subjectiv[e] complain[t]s do not establish disabling pain.'" 826 F.2d 996 at 1001. The ALJ then

---

[20] *Jones* refers to *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529 (11th Cir.1993).

failed to articulate the combined effect of the physical impairments with the plaintiff's complaints of pain (which the ALJ also treated improperly). *Id.* The omission constituted an error of law and was grounds for reversal. *Id.* The Eleventh Circuit did not define what constitutes "well-articulated findings" and did not state how much more analysis was needed. *See Walker*, 826 F.2d at 996.

The *Jones* holding is a much less restrictive standard. 941 F.2d at 1533. The Eleventh Circuit held the following statement suffices concerning articulation of the effects of combined impairments:

> [B]ased upon a thorough consideration of all evidence, the ALJ concludes that appellant is not suffering from any impairment, or a combination of impairments of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months.

*Wheeler v. Heckler,* 784 F.2d 1073, 1076 (1986).  The ALJ in the *Jones* case stated:

> While [the plaintiff] "has severe residuals of an injury to the left heel and multiple surgeries on that area," [the plaintiff] does not have "an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4."

*Id.* The Eleventh Circuit found that the two aforementioned statements were analogous and that the latter statement  "evidences consideration of the combined effect of appellant's impairments." 941 F.2d at 1533.  *Jones,* did not overrule, distinguish or even mention *Walker*.[21] *Jones*, 941 F.2d at 1529–34.

In this matter, the *Jones* standard is satisfied by the ALJ's statement that the plaintiff

---

[21] *Jones* was decided four years after *Walker*. Eleventh Circuit cases have since followed both *Jones* and *Walker*, so it cannot be said that either have been overruled. *See e.g.*, *Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (following *Jones* nine years after *Davis*); *Davis*, 985 F.2d 528 (11th Cir. 1991) (following *Walker* two years after *Jones*).

"does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926)." (Tr. 20); *See* 941 F.2d at 1533. The ALJ in this matter also spoke at length in his opinion about the plaintiff's impairments and evidence in the record that supports his finding, in conjunction with *Jones*. *See* 941 F.2d at 1529-34; (Tr. 17–29).

The plaintiff attempts to compel this Court to follow *Walker* because, according to the plaintiff, the ALJ in the instant case, similarly to *Walker*, failed to "factor all of [the plaintiff]'s impairments and symptoms into his analysis." (DE #24 at 13–14); *See* 826 F.2d 996 at 1001. The plaintiff claims the ALJ erred by failing to consider the combined effects of the plaintiff's "[paragraph] B Personality traits, anxiety as measured by the State-Trait Anxiety Inventory (STAI), depressive symptoms as measured by the Beck Depression Inventory (BDI), impairment of the dominant hand as measured by the Grooved Pegboard Test, and obesity." (DE #24 at 13). The ALJ does not mention obesity in his decision. (Tr. 17–29). The ALJ also does not specifically mention the tests/inventories individually, but instead notes, as evidenced by the record, that "all objective testing for memory and mental speed suggested mild to moderate impairments." (Tr. 20, 504, 768). The record reflects that all of the tests and inventories suggest mild or moderate impairments of the plaintiff, despite the fact that the plaintiff claims the ALJ did not adequately analyze the tests.  (DE #24 at 13); (Tr. 20, 25, 504, 506, 510, 768). However, STAI and BDI are not tests for memory and mental speed. STAI is a test utilized in diagnosing anxiety and differentiate it from depressive syndromes. BDI is a self-reported inventory that is used to measure characteristic attitudes as well as symptoms of depression.  Therefore, the ALJ's statement regarding all objective tests for memory and mental speed does not encompass the STAI and BDI inventories.

The undersigned agrees with the defendant that the *Jones* case applies in this matter and finds that there was no error on the part of the ALJ with respect to his analysis of the relevant evidence.

### III. The ALJ's Decision to Give the Treating Psychotherapist's Opinion Little Weight is Supported by Substantial Evidence.

As previously noted, treating physicians' medical opinions are entitled to great weight, absent good cause. *Lewis*, 125 F.3d at 1440; *see supra* n. 17. "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.1986)). An ALJ may also discredit a treating physician's opinion if it is contradictory with their own notes and the plaintiff's "own testimony regarding her daily activities." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

The defendant argues that the ALJ's reasoning in discounting Dr. Rivera's opinion is justified in part because Dr. Rivera opined on issues reserved for the commissioner, the DDS advisors' opinions undermine Dr. Rivera's opinion and the notes from Dr. Mendez undermine Dr. Rivera's opinion. (DE# 25 at 8–10). The plaintiff claims the defendant's contentions are invalid *post hoc* rationalizations because the ALJ never raised these as reasons to discredit Dr. Rivera's opinion. (DE #28 at 5); (Tr. 17–29). The undersigned finds that there is substantial evidence from the entire record to support the ALJ's decision to discount Dr. Rivera's opinion, which supports the ALJ's decision regarding disability in this matter.

The ALJ's assertion that Dr. Rivera's opinion is internally inconsistent is supported by substantial evidence. The ALJ addressed the fact that Dr. Rivera assessed the plaintiff with having moderate depression, GAF scores in the mid sixties (indicative of mild symptoms) and

then diagnosed the plaintiff with major depression. (Tr. 25–27, 687–88). The plaintiff contends

that the ALJ erred by failing to explain why this is an inconsistency.[22] (DE #24 at 9). The

undersigned disagrees because a diagnosis of major depression is inherently inconsistent with

assessing moderate symptoms per one assessment (BDI) and mild symptoms in another (GAF).

The undersigned finds that this internal inconsistency supports the ALJ's decision to give

little weight to Dr. Rivera's opinion and is substantial evidence that supports the ALJ's

conclusion. *See Miles*, 84 F.3d at 1400. The plaintiff also contends that there are other issues

regarding the ALJ's discrediting of Dr. Rivera's opinion, however, this Court may not substitute

the judgment of the Commissioner. *See Martin*, 894 F.2d at 1529; *Baker v. Sullivan*, 880 F.2d at

321.  In accordance with the foregoing, the undersigned finds that the ALJ's decision to assign

little weight to Dr. Rivera's opinion was correct and there was no error on the part of the ALJ.

### IV. The ALJ's Reliance on a Reviewing Physician's Opinion was Proper

The opinion of a non-examining reviewing physician is afforded little weight when

contrary to a treating physician's opinion and, when taken alone, does not amount to substantial

evidence. *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987); *see also Swindle v. Sullivan*,

914 F.2d 222, 226 n.3 (11th Cir. 1990) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th

Cir.1985)) The Eleventh Circuit remanded *Swindle, Sharfaz* and *Broughton* because the ALJ did

not provide good cause for discounting a treating physician's opinion and then relied on a non-

---

[22] The plaintiff also contends this does not amount to an inconsistency because of Dr. Rivera's reliance on the existence of paragraph B Personality Traits. (DE #24 at 9). However, in his decision, the ALJ found that the record supported that the plaintiff did not satisfy paragraph B. (Tr. 20–21). In fact, Dr. Rivera assessed the plaintiff with having borderline traits in her treatment notes, both before and after the MSS in which she opined the plaintiff satisfied paragraph B. (Tr. 25, 504, 506, 510, 685–88, 709–12, 722–26, 735–39, 742–46, 760–69, 780–84, 796–800, 838–42, 863–67, 881–85, 897–901, 931–35).

examining reviewing physician's opinion. 914 F.2d at 226; 825 F.2d at 280; 776 F.2d at 962.

The defendant cites two Eleventh Circuit cases, *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013)*, and *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873–74 (11th Cir. 2011), that hold an ALJ may give weight to a non-examining reviewing physician's opinion over a treating physician's opinion. (DE #25 at 10). In *Cooper*, the ALJ properly assigned little weight to a portion of a treating physician's opinion. 521 F. App'x at 806–7. The court in *Cooper* noted that "even if the non-examining doctor was unable to review all of [the plaintiff's] medical records . . . , she cited several portions of the record in support of her conclusions, and the ALJ, who made the ultimate determination, had access to the entire record as well as [the plaintiff's] testimony). *Id.* The Eleventh Circuit found these circumstances demonstrated that the ALJ gave the proper weight to the opinion of the non-examining doctor. *Id.*

In *Jarrett*, the Eleventh Circuit also held the ALJ did not err in giving significant weight to a non-examining state consultant. 422 F. App'x at 869–74. The court first noted that the ALJ properly gave little weight to a treating physicians' opinion. *Id.* at 873–74. The *Jarrett* Court concluded that "the ALJ did not err in giving [the treating physician's] opinion little weight and instead crediting the opinions of the state agency consultants, because their opinions were supported by the record." *Id.*

In this matter, the ALJ properly discredited the treating doctors' opinions. (Tr. 23–25).  In the instant case the ALJ properly gave little weight to the treating doctors' medical opinions. This case is similar to *Cooper*, because the ALJ in the instant case did not unconditionally adopt Dr. Weiner's opinion. The instant case is similar to *Jarrett* because in this matter it does not appear that the plaintiff contends the opinion of Dr. Weiner contradicts any of the opinions of treating physicians' opinions. The plaintiff only calls Dr. Weiner's opinion "questionable." (DE

#24 at 15).[23] The undersigned finds that the cases of *Cooper* and *Jarrett* are applicable in this matter, the ALJ's reliance on the reviewing physician's opinion was proper, and there was no error on the part of the ALJ.

**V. The ALJ's Hypothetical Question to the VE was Proper and No Disability was Established by the VE's Testimony**.

An ALJ must pose a hypothetical to a VE that encompasses all of the plaintiff's impairments for the VE's response to constitute substantial evidence. *Wilson v. Barnhardt*, 284 F.3d 1219, 1227 (11th Cir. 2002); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). Under *Winschel*, a hypothetical does not account for limitations in concentration, persistence or pace by restricting the hypothetical question to simple, routine tasks or unskilled work unless the ALJ indicated medical evidence suggesting the plaintiff's ability to work is unaffected by the limitation. *See* 631 F.3d at 1180–81.

The undersigned disagrees with the plaintiff's contention that the ALJ's hypothetical failed to meet the *Winschel* standard. (DE #24 at 17–18) (DE #28 at 9–10). As previously noted above, the ALJ properly relied on Dr. Wiener's medical opinion. The ALJ noted that Dr. Weiner opined that the plaintiff had moderate limitations in concentration, persistence or pace but these limitations were not disabling and the plaintiff could still perform "simple, unskilled repetitive assignments and tasks without difficulty." (Tr. 25, 97–98). The ALJ then, in accordance with *Winschel*, used these medical findings to explicitly and implicitly account for the plaintiff's moderate limitations in concentration, persistence or pace in his hypothetical question. 631 F.3d at 1180-81; (Tr. 72–73). The VE then identified some work that the plaintiff could sustain in the

---

[23] In section III above, the undersigned discusses the issue of weight given to practitioners.

national economy. (Tr. 28, 73–74). The undersigned finds the VE's response to the ALJ's proper hypothetical constitutes substantial evidence in support of the ALJ's ultimate finding that the plaintiff is not eligible for disability.

**CONCLUSION**

The undersigned finds the ALJ's findings and ultimate decision are based on substantial evidence and was proper.

**RULING**

In accordance with the foregoing, it is

**ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment (DE #25, 1/09/2017) is **GRANTED** and that the Plaintiff's Motion for Summary Judgment (DE #24, 12/08/2016) is **DENIED**.  The Clerk of Court is directed to mark this case as CLOSED.

DONE AND ORDERED at the United States Courthouse, Miami, Florida this 27th day of July, 2017.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:

All counsel of record